FEIN CONTAINER
CORPORATION, Plaintiff,

v.

LOCAL NO. 810, STEEL METALS AL-
LOYS AND HARDWARE FABRICA-
TORS AND WAREHOUSEMEN, Affil-
iated With International Brotherhood
of Teamsters, Defendant.

Civ. No. 86–4320.

United States District Court,
D. New Jersey.

Nov. 2, 1986.

Pechner, Dorfman, Wolfee, Rounick and Cabot New York City, for plaintiff.

Reitman, Parsonnet, Maisel & Duggan Newark, N.J., for defendant.

HAROLD A. ACKERMAN, District Judge.

On October 25, 1986, members of Local Union Number 810, Steel Metal Alloys and Hardware Fabricators and Warehousemen, affiliated with the International Brotherhood of Teamsters, began a strike against their employer, Fein Container Corporation of Saddle Brook, New Jersey. Fein instituted suit against Local 810 seeking a Temporary Restraining Order and preliminary injunctive relief. Specifically, Fein sought an injunction prohibiting Local 810's work stoppage, an injunction ordering Fein and Local 810 to arbitrate a dispute concerning the duration of their Collective Bargaining Agreement originally entered into on February 21, 1983, and compensatory and punitive damages.

The matter was originally brought to federal court on October 30, 1986. On that day, the Honorable Alfred J. Lechner, Jr. of this district granted Fein's request for a Temporary Restraining Order prohibiting picketing on the part of the Union and its members.

Soon thereafter, the employer sought to have the Union held in contempt for violating Judge Lechner's Order. Because the case had been assigned to me, I began hearing testimony on the contempt motion. The employer then determined that it would prefer to have the Court hear testimony relating to its application for preliminary injunctive relief. I acceded to the employer's request. Therefore, I now have before me Fein's application for preliminary injunctive relief.

Fein's request for preliminary injunctive relief has two parts. First, the request for an injunction against the strike and, second, the request for an injunction ordering Fein and Local 810 to arbitrate the dispute concerning the duration of their 1983 Collective Bargaining Agreement. See Plaintiff's Memorandum of Law In Support of Motion for Temporary Restraining Order at Page 11, Plaintiff's Supplemental Brief in Support of the Motion for Temporary Restraining Order/Preliminary Injunction at Pages 13 and 14, and Plaintiff's Verified Complaint at Pages 5 and 6. I shall address each part of Fein's two-part request in turn. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I hereby make findings of fact and conclusions of law.

First, I address Fein's request for an injunction against the strike. Fein brings its claims under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. Section 185(a) (1982). Section 301(a) gives federal courts jurisdiction over disputes for violation of Collective Bargaining Agreements. Section 4 of the Norris-LaGuardia Act, 29 U.S.C. Section 104 (1982), qualifies that jurisdiction. Section 4 provides in part that: "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such disputes ... from doing, whether singly or in concert, any of the following acts: (a) Ceasing or refusing to perform any work or to remain in any relation of employment...." 29 U.S.C. Section 104.

The Supreme Court of the United States has recognized certain narrow exceptions to Section 4, exceptions which effectively restore to the federal courts jurisdiction to issue injunctions in cases brought under Section 301(a) of the Labor Management Relations Act. One of these exceptions was announced in *Boys Markets, Inc. v. Retail Clerks*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), and refined in *Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) and *Jacksonville Bulk Terminals, Inc. v.*

*Longshoremen,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). It is upon this, the *Boys Markets* exception, that Fein relies today in requesting this Court to enjoin the strike by Local 810. In effect, Fein seeks a *"Boys Markets* injunction." See *Avco Corporation v. Local Union #787,* 459 F.2d 968, 969 (3d Cir.1972).

In *Boys Markets,* the Supreme Court defined a specific, narrow instance in which federal courts were empowered to enjoin strikes by Unions. The Court stated that: "Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in *Sinclair [Refining Co. v. Atkinson,* 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) ] suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief—principles that we now adopt: 'A District Court entertaining an action under Section 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.' 370 U.S. at 228, 82 S.Ct. at 1346." 398 U.S. at 253–54, 90 S.Ct. at 1594.

The Court further stated that in the case before it there was "no dispute that the grievance in question was subject to adjustment and arbitration under the collective-bargaining agreement." 398 U.S. at 254, 90 S.Ct. at 1594.

In each of the two later cases, *Buffalo Forge* and *Jacksonville Bulk Terminals,* the Court found that it was not beyond dispute that the grievance over which the Union had struck was subject to arbitration under the Collective Bargaining Agreement.

In the *Jacksonville* case, a union local affiliated with the International Longshoremen's Association refused to load goods onto a ship bound for the Soviet Union, in apparent reaction to the Soviet invasion of Afghanistan and President Carter's announcement, on January 4, 1980, that certain commercial ties between the United States and the Soviet Union would be broken in reprisal for the invasion. 457 U.S. at 704–05, 102 S.Ct. at 2676.

The employer sought, inter alia, a *Boys Markets* injunction against the work stoppage. 457 U.S. at 706, 102 S.Ct. at 2677. The Court stated that "the Employer argues that the Union's work stoppage may be enjoined under the rationale of *Boys Markets, Inc. v. Retail Clerks,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), and *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), because the dispute underlying the work stoppage is arbitrable under the collective-bargaining agreement. In making this argument, the Employer disavows its earlier argument that the underlying dispute is purely political, and asserts that the Union's work stoppage was motivated by a disagreement with the Employer over the management-rights clause in the collective-bargaining agreement ... We disagree. *Buffalo Forge* makes it clear that a *Boys Markets* injunction pending arbitration should not issue unless the dispute underly-

ing the work stoppage is arbitrable. The rationale of *Buffalo Forge* compels the conclusion that the Union's work stoppage, called to protest the invasion of Afghanistan by the Soviet Union, may not be enjoined pending the arbitrator's decision on whether the work stoppage violates the no-strike clause in the collective-bargaining agreement. The underlying dispute, whether viewed as an expression of the Union's 'moral outrage' at Soviet military policy or as an expression of sympathy for the people of Afghanistan, is plainly not arbitrable under the collective-bargaining agreement.

"The attempts by the Solicitor General and the Employer to characterize the underlying dispute as arbitrable do not withstand analysis. The 'underlying' disputes concerning the management-rights clause or the work-conditions clause simply did not trigger the work stoppage. To the contrary, the applicability of these clauses to the dispute, if any, was triggered by the work stoppage itself. Consideration of whether the strike intruded on the management-rights clause or was permitted by the work-conditions clause may inform the arbitrator's ultimate decision on whether the strike violates the no-strike clause. Indeed, the question whether striking over a nonarbitrable issue violates other provisions of the collective-bargaining agreement may itself be an arbitrable dispute. The fact remains, however, that the strike itself was not over an arbitrable dispute and therefore may not be enjoined pending the arbitrator's ruling on the legality of the strike under the collective-bargaining agreement ... The Employer's argument that this work stoppage may be enjoined pending arbitration really reflects a fundamental disagreement with the rationale of *Buffalo Forge,* and not a belief that this rationale permits an injunction in this case. The Employer apparently disagrees with the *Buffalo Forge* Court's conclusion that, in agreeing to broad arbitration and no-strike clauses, the parties do not bargain for injunctive relief to restore the status quo pending the arbitrator's decision of the legality of the strike under the collective-bargaining agreement, without regard to what triggered the strike. Instead, they bargain only for specific enforcement of the union's promise to arbitrate the underlying grievance before resorting to a strike. See 428 U.S. at 410–412, 96 S.Ct. at 3148–49." 457 U.S. at 720–23, 102 S.Ct. at 2684–85.

■ Thus, the *Jacksonville* case makes it clear that a *Boys Markets* injunction should not issue in every case in which a union strikes over some dispute, the propriety of the strike is unclear under the terms of the Collective Bargaining Agreement, and the Collective Bargaining Agreement binds the parties to arbitrate disputes arising under the agreement. In addition, the dispute over which the union strikes, the dispute which "triggers" the work stoppage, must be arbitrable under the terms of the Collective Bargaining Agreement. Only then may a *Boys Markets* injunction issue.

When deciding whether to grant preliminary relief in the form of a *Boys Markets* injunction, the Court must follow procedures set down by Sections 7 and 9 of the Norris-LaGuardia Act. See *United Telegraph Workers v. Western Union,* 771 F.2d 699, 704 (3d Cir.1985). Specifically, the Court must hold an evidentiary hearing and take "the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered ..." 29 U.S.C. Section 107 (1982).

On November 7, 1986, this Court held an evidentiary hearing, in conformance with the procedural requirements of the Norris-LaGuardia Act, concerning the job action alleged by Fein in its Verified Complaint, the causes of the job action, and its effects. Based on the evidence presented at that hearings, I make the following findings of fact:

Immediately before February 20, 1986, there existed in full force between Fein and Local 810 a Collective Bargaining Agreement entered into on February 21, 1986.

As a result of the unhealthy financial condition in which it found itself at that time, Fein entered into negotiations with Local 810 seeking an extension of the Collective Bargaining Agreement. Fein wished to continue operating under the terms contained in the old agreement, rather than enter into a new agreement containing new and presumably more expensive terms. The parties agree that they extended the terms of the old Collective Bargaining Agreement to March 7, 1986, by executing a written extension to the agreement.

The parties agree that they extended the old Collective Bargaining Agreement a second time, beyond March 7, 1986. The parties disagree as to how long they extended the agreement beyond March 7, 1986. Both parties admit to the existence of two more "extenders" which by their terms purported to extend the agreement beyond March 7. One purported extender continued the terms of the agreement until February 20, 1987. Another purported extender, which, if executed at all, was executed after the February 20, 1987 extender, continued the terms of the agreement only to October 24, 1986.

Local 810 claims that it never agreed to the February 20, 1987 extender and that the October 24, 1986 extender was properly executed and defines the termination date of the Collective Bargaining Agreement. Fein contends that both parties agreed to the February 20, 1987 extender, and that later both parties agreed to replace the 1987 extender with the shorter October 24, 1986 extender, but only upon certain conditions which were never fulfilled. As a result, Fein claims that the October 24, 1986 extender never took effect, and the February 20, 1987 extender continues to define the termination date of the Collective Bargaining Agreement. On October 25, 1986, the day after the date on which Local 810 claims the agreement expired, Fein Container Corporation was struck.

I find that two disputes exist between Fein and Local 810. The first dispute concerns the date on which the Collective Bargaining Agreement entered into on February 21, 1983 ceased or ceases to exist. The second dispute concerns the wages, terms, and working conditions which Fein should provide to Local 810 members, once the February 21, 1983 agreement has ceased to exist. The first dispute, when the old contract ended or ends, is ancillary to and outweighed by the underlying dispute in this case: What terms the new contract should specify.

It is clear from the facts that the dispute over new terms gave birth to the ancillary dispute over contract duration and has always overshadowed it. As early as October 1985, Fein was concerned by the prospect of negotiating a new agreement. Testimony of Mark Fein, Proceedings of November 7, 1986 at Page 45. The parties originally agreed to extend the 1983 agreement beyond its termination date to March 7, 1986, because Fein feared for its financial health under a new, more expensive agreement, and the parties hoped that an extension would provide them with the time necessary to strike a deal on a new agreement which would be acceptable to both sides. See testimony of Mark Fein, Proceedings at Page 47. Negotiations regarding the other purported extensions turned on the same crucial issue—what wages, terms and working conditions Fein should provide to Local 810 members. See testimony of Mark Fein, Proceedings at 52–56. Fein itself contends that the execution of the October 24, 1986 extender was conditioned on reaching an agreement regarding wages, terms and working conditions. See testimony of Mark Fein, Proceedings at 55–59. See also the testimony of Burton Marcus, Proceedings at 78–88. See generally testimony of Desmond Massey, Proceedings at 102–118. The testimony before me clearly established that the central dispute facing Fein and Local 810 was a dispute over the terms of whatever employment agreement would succeed the agreement struck on February 21, 1983.

It is just as clear that the parties are in dispute over the proper termination date of the old agreement. But that dispute did not arise until after the end of

negotiations between the parties over future contract terms. Indeed, at the one point in the ongoing negotiations when the termination issue might squarely have arisen, the parties ignored it. Sixty days before October 24, 1986, Local 810 sent Fein a letter notifying Fein that the Collective Bargaining Agreement was about to expire. Local 810 sent another notice 30 days before October 24, 1986. Testimony of Burton Marcus, Proceedings at 94–98. Fein considered the letters to be "formalities" and ignored them. Testimony of Burton Marcus, proceedings at 96. Apparently, neither party raised the termination issue in any other way. Once Local 810 began its strike, Fein made the claim that the old agreement had not yet run out, and the dispute over termination was joined. But it is clear that the termination dispute did not precipitate Local 810's job action. Rather, the dispute blossomed only after the job action began, and at this point does little more than divert the parties' attention from their more basic disagreements. Were the parties to resolve the termination dispute today, they would do no more than clarify the time-table and means by which their central dispute over new contract terms would continue.

When the agreement ended or ends is an issue which can only be decided by interpreting the terms of the agreement. That interpretation must be made at the proper time and in a forum possessing the proper jurisdiction. It may be that, by striking on October 25, 1986, Local 810 violated the terms of the agreement and is, therefore, conducting a strike prohibited by the agreement. That Local 810 is conducting a forbidden strike, however, is not a sufficient reason to grant a *Boys Markets* injunction. See *Jacksonville Bulk Terminals*, 457 U.S. at 722, 102 S.Ct. at 2685, and the discussion of that case supra. I find that the dispute which triggered Local 810's job action, the dispute over which Local 810 has struck, is a dispute concerning the terms of a future labor agreement and not the termination date of the old agreement. The dispute over new terms is not itself an arbitrable dispute. The old agreement does not bind the parties to arbitrate the terms of successor agreements. See the agreement of February 21, 1983 at 8, Article X, and at 14–15, Article XVIII. Therefore, the strike by Local 810 is not over an arbitrable grievance. As *Jacksonville Bulk Terminals* instructs, this Court is, under Section 4 of the Norris-LaGuardia Act, without jurisdiction to enjoin Local 810's work stoppage, whether or not it violates the provisions of the 1983 Collective Bargaining Agreement.

In reaching this conclusion, I draw instruction from the 8th Circuit decision in *Purex Corporation v. Local 618*, 705 F.2d 274 (8th Cir.1983). In *Purex*, the Circuit Court affirmed the judgment of the District Court denying a *Boys Markets* injunction as a form of preliminary injunctive relief, in a case whose facts are strikingly similar to the facts of the case at hand. The Circuit Court stated those facts as follows: "Purex and the Automotive, Petroleum and Allied Industrial Employees Union, Local 618 have been parties to a series of collective-bargaining agreement over a number of years. In 1979, the parties entered into a collective-bargaining agreement containing the following duration provisions: Article 2. Section 1. The term of this agreement shall commence on the first day of July, 1979 and shall continue until the 30th day of June, 1982, and for additional periods of one (1) year thereafter, with the provision that should either party desire to modify or amend any portion or any of the terms hereof, it shall notify the other party in writing not less than sixty (60) days prior to the 30th day of June, 1982, or at the end of any subsequent yearly period.

"Section 3. If the terms for an amended Agreement have not been agreed to by the anniversary date of this Agreement then this Agreement shall govern until one of the parties has given the other five (5) days' written notice of termination of this Agreement.

"The agreement also contained a mandatory arbitration clause and a corresponding no-strike clause.

"On April 17, 1982, well in advance of the required 60 days prior to the contract's termination date, the Union gave Purex notice that it desired to renegotiate the contract. The parties negotiated without success, and on June 24, the Union delivered a letter to Purex which purported to be the five days' notice of termination required by Article 2, Section 3 of the contract. On July 6, the Union sent a letter to Purex rejecting Purex's final contract proposal. The letter went on to say 'I (a Union official) must assume you (Purex) are not willing to negotiate and Local 618 will act accordingly.' Thereafter, the Union commenced strike activities on July 14.

"Purex immediately sought a temporary restraining order and a preliminary injunction against the strike from the District Court. Purex argued that the Union's notice of contract termination was defective, and therefore the contract, including the no-strike clause, remained in effect when the strike began. Under Purex's interpretation of the duration clause, the five-day notice may not be given until after the contract's termination date, and accordingly the Union's June 24th letter was premature. The District Court denied the temporary restraining order on July 15, and, following a hearing on July 16, denied injunctive relief as well." 705 F:2d at 275–76.

As in the case at hand, the controversy in *Purex* involved a dispute over the duration of the old Collective Bargaining Agreement, and a dispute over the content of whatever new agreement would succeed the old agreement. The 8th Circuit, looking to *Buffalo Forge* and the *Jacksonville* case, noted that the very purpose of the *Boys Markets* exception would be disserved by granting a *Boys Markets* injunction against Local 618. The Court stated that "The Supreme Court's opinions in *Buffalo Forge* and *Jacksonville Bulk Terminals* analyze the *Boys Markets* exception as a means for effectuating the national policy favoring agreements to arbitrate, and not as an enforcement mechanism for no-strike clauses. Both *Buffalo Forge* and *Jacksonville Bulk Terminals* distinguish between strikes where the underlying dis-

pute is arbitrable and those where the legality of the strike itself is arbitrable. Only in the former category are strikes subject to injunction, because only there does the strike represent a breach of the Union's agreement to arbitrate." 705 F.2d at 276.

■ I agree with the 8th Circuit in *Purex. Boys Markets* and its progeny do not give the Courts a blanket power to enjoin strikes during the life of a Collective Bargaining Agreement. Rather, they give Courts power to enjoin strikes when arbitration offers an agreed to, alternative means of restoring harmony to the employer-employee relationship. That is not the case here. Were an injunction to issue in the case at hand, it would not resolve the bedrock dispute between Fein and Local 810 regarding future terms of employment. Therefore, this case does not fall within the *Boys Markets* exception to Section 4 of the Norris-LaGuardia Act. This Court is without jurisdiction to enjoin the job action which Local 810 has begun against Fein. Given this conclusion, I need not consider further whether Fein's request that the Local 810 job action be enjoined merits preliminary injunctive relief. See *Purex,* 705 F.2d at 277. See also *U.S. v. Price,* 688 F.2d 204, 211 (3d Cir.1982).

■ I now turn to Fein's request for an injunction compelling the parties to arbitrate the ancillary dispute over the duration of the February 21, 1983 Collective Bargaining Agreement. Section 301(a) provides federal courts with jurisdiction to grant such relief, and Section 4 of the Norris-LaGuardia Act does not revoke that jurisdiction.

Since the time of the *Steelworkers Trilogy* in 1960, the U.S. Supreme Court has instructed that the interpretation of arbitration clauses in Collective Bargaining Agreements is to be guided by a strong presumption favoring arbitrability of disputes arising under the agreement.

In *Steelworkers v. Warrior & Gulf,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the second of the three cases com-

prising the *Steelworkers Trilogy,* the Court stated that, "In the absence of any express provision excluding the particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where ... the arbitration clause (is) quite broad." 363 U.S. 584–85, 80 S.Ct. at 1354. Accord, *AT & T Technologies, Inc. v. Communications Workers of America,* —— U.S. ——, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

In a decision following *Warrior & Gulf,* the 3d Circuit added its own gloss to the arguments favoring the presumption of arbitrability:

"There are strong reasons supporting the federal policy in favor of arbitration. First, arbitrators are more competent than courts to interpret labor contracts and to resolve the problems of labor-management relations. *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Second, the process of arbitration contributes to the maintenance of labor peace. *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). Third, ordering arbitration is essential in effectuating the parties' contractual intent to settle disputes through arbitration. Fourth, a suit for damages rather than an injunction ordering arbitration 'might not repair the harm done by the strike, and might exacerbate labor-management strife.' Note, *Labor Injunction, Boys Markets, and the Presumption of Arbitrability,* 85 Harv.L.Rev. at 638, citing, *Boys Markets, Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235, 248, 90 S.Ct. 1583 [1591], 26 L.Ed.2d 199 (1970)." *Avco Corp. v. Local Union # 787,* 459 F.2d 968, 973 (3d Cir.1972).

I note additionally that parties have been known to agree to submit the issue of Collective Bargaining Agreement duration to arbitration. *Moldovan v. The Great Atlantic & Pacific Tea Co., Inc.,* 790 F.2d 894 (3d Cir.1986). Furthermore, the 3d Circuit has enforced agreements to arbitrate dis-

putes concerning contract duration. *Wilkes-Barre Publishing Co. v. Local 120,* 647 F.2d 372 (3d Cir.1981); *Becker Autoradio v. Becker Autoradiowerk GmbH,* 585 F.2d 39 (3d Cir.1978). Nor is inconsistent to ask an arbitrator to rule on whether the contract which grants him jurisdiction to decide disputes has already ended. The obligation to arbitrate contract disputes may outlast the contract itself. *Nolde Bros., Inc. v. Local No. 358,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977).

In the case at hand, the Collective Bargaining Agreement contains a provision covering termination of the agreement. That provision states in full: "Article XXXV. Termination of Agreement. "The term of this Agreement shall commence on February 21, 1983, and expire on February 20, 1986, at 12:00 midnight. Negotiations for a new Agreement shall commence sixty (60) days prior to the expiration hereof." Collective Bargaining Agreement at Page 24. The provision is silent as to whether the agreement may be extended, and if so, who is to decide when the extensions lapse and the agreement finally terminates.

In other provisions, however, the agreement sets out a broad arbitration clause. First, the agreement states: "Article X. Prohibition of Strikes and Lockouts ... B. The parties recognize and agree that the grievance and arbitration procedures set forth herein shall be the sole and exclusive means for the determination of all disputes, complaints, controversies, claims or grievances whatsoever, including a claim based upon an alleged breach of this Agreement. This provision shall be a complete defense to, and also grounds for a stay of any action or proceeding instituted contrary to this Agreement." Collective Bargaining Agreement at Page 7–8. Second, the agreement states: "Article XVIII. Arbitration.

"Should any dispute arise under the terms of this Agreement, the same shall be settled in the following manner:

"1.....

"4. Notwithstanding the above procedure, the Union may, in the first instance

and without reducing the grievance to writing, take the grievance up directly with the Employer.

"5. The parties agree that arbitration shall be conducted by an arbitrator selected by the New Jersey State Board of Mediation." Collective Bargaining Agreement at Pages 14–15.

Given these broad provisions, calling for arbitration of "all disputes ... whatsoever" regarding the agreement, and the presumption of arbitrability governing interpretations of arbitration clauses in Collective Bargaining Agreements, I find that the parties have agreed to arbitrate the issue of termination of the agreement. I shall, therefore, grant Fein's request for an injunction compelling the parties to arbitrate the issue of when, exactly, the 1983 agreement has ended .or will end. As a result of this conclusion, I need not consider further whether Fein's request for an arbitration order merits preliminary injunctive relief. See *U.S. v. Price*, cited supra.

I wish to note precisely what issues this opinion does not decide. It does not decide the issue of when the 1983 Collective Bargaining Agreement terminates. It does not decide Fein's claims for damages against Local 810. It does not decide any counterclaims brought by Local 810. At this point in time I deny Fein's request for a *Boys Markets* injunction against the job action instituted by Local 810, and grant Fein's request for an injunction compelling arbitration of the issue of contract duration.